Case number 23-1083, Timothy Finley v. Erica Huss et al., argument not to exceed 15 minutes per side. Ms. Monta, you may proceed for the appellate. You may proceed. Thank you. Good morning. May it please the Court, Christine Monta for the appellant, Timothy Finley. I'd like to reserve three minutes for rebuttal, please. Defendants violated Mr. Finley's clearly established Eighth Amendment rights because they imposed on him a condition, months of near-total isolation, that they knew was likely to harm him psychiatrically and induce him to harm himself physically. I'm sorry to interrupt you right away, but may I ask you, so it seems to me the threshold question that we have to figure out is, is there a binding case that says it's unlawful to put a mentally ill inmate in segregation? Is that fair? No, Your Honor, because that's not what our claim is. Our claim is not a broad claim that it's unlawful to put mentally ill prisoners in segregation. Our claim is that it is unlawful to impose on a prisoner a condition that you know is going to harm him. In this case, defendants knew that... Isn't that true? I mean, most things in prison in some sense harm him, and here we could debate whether it harmed him. Every time he was out in the general population, he was cutting himself and swallowing razor blades. And so the general population, you could bring the flip side case, which is by leaving him in the general population, I mean, it seems to me they had clear evidence that by doing so he was going to harm himself, if not others. He had 348 misconduct violations. Why? I mean, it seems they're violating the Constitution if they do, and they're violating the Constitution if they don't. No, Your Honor. First of all, as a factual matter, that's not accurate. Mr. Finley was not engaging in any self-harm while he was in general population. He was in general population when his psychiatric crisis began, and when he informed them that... When was he swallowing razor blades and cutting himself? Did he never do that in the general population? No, Your Honor. Never. Where was he? He was in isolation, in an observation cell, or in segregation, in solitary confinement. Those were the only places that he was... But he was getting the razor blades outside of those, right? He got the razor blade, it was alleged. I thought I read that he got the razor blade in general time. As to the second instance of swallowing razor blades, we know that he was given that razor blade by prison staff when he was in general population, but when he failed to return it, he was then moved to segregation and then to observation, and it's there that he began to cut himself. So defendants knew that it was only when he was in isolating conditions that he was actually undertaking this kind of self-harm. Someone who constantly violates the rules, they can't put in segregation if they're mentally ill? Because that's over a quarter of the prison population. Your Honor, that fact is also not an accurate representation of what happened. The misconducts to which you're referring, the vast majority of those that the district court cited, occurred in the two-year period after the events at issue in this case. Mr. Finley did not have any disciplinary infractions from the time he arrived at Marquette Branch Prison in May until a week after he swallowed his first razor blade. So all of the... You had 348 in that short period? No, Your Honor. Those are well after the time frame that's at issue in this case. In the time frame that is at issue in this case, he incurred a handful of what they called disciplinary infractions, but they were as a result of his devolving mental state. His mental state was devolving and he was telling them that and asking them for treatment, and they were slapping him with disciplinary infractions. But the question at issue in this case is not so much those disciplinary infractions. It's whether defendants, when they made their decision starting on September 27th to put Mr. Finley into indefinite solitary confinement in one of the prison's most isolating segregation cells, whether that conduct was unconstitutional. Is it right that two days in they put him on the wait list for ICP? No, Your Honor. They put him on the wait list for ICP over a month after Defendant Huss initially permanently reclassified Mr. Finley to solitary confinement. Her classification was September 27th. But I thought that he didn't go in for a month. Is that right? That's incorrect. This is something that the parties dispute, but he went into solitary immediately and then immediately engaged in self-harm. How can they dispute it? Don't you know one way or the other? No, sorry. I should clarify. That's not disputed. What's disputed is whether the time period, so there was a time period in that initial month where he was not physically in his segregation cell because he had harmed himself. And so he was airlifted to a hospital. He spent six days in the hospital. And then on his return from the hospital, he spent approximately 20 days in observation where he was being medicated. What's disputed is are any harms he incurred in that time frame attributable to the defendants or whether they should get a pass for that time period. But it was a month between when Defendant Huss initially referred Mr. Finley to, or excuse me, transferred him to solitary, and when Mr. Finley's assigned mental health clinician alerted Defendant Schroeder, who had then become the deputy warden, that his treatment needs couldn't be met in that setting and that he should be placed in the interim care program. It was four days after that, on October 31st, that Defendant Schroeder put him in the interim care program. But then, of course, she put him on the wait list, but then she left him in solitary confinement knowing that it was harming him, knowing that his treatment needs couldn't be met because she had been told that, for another two and a half months after that period. Once he learned that he was actually on the wait list for this interim care program and he started to receive drugs, he stopped his self-harm at that point, as I understand the  He stopped self-harming because he was receiving this medication and the medication suppressed his impulse to swallow razor blades or engage in any other kind of self-harm. But your claim for the period after that is that he was still mentally decompensating, being harmed by the conditions of confinement, right? That's absolutely correct, Your Honor. So if we sort of cut to the chase, we know that he had problems. We know that he needed some sort of special care. I'm going to ask the other side why he was able to still get razor blades. That's not really explained by the record. But what were they to do with him at the point when they finally understood he needed to go to ICP, but there wasn't any space in that particular program? Your Honor, there were a number of things that they could have done. First of all, Defendant Schroeder herself testified that she had the ability to move him up and down, move prisoners up and down the wait list. So she could have expedited his move to the ICP. There were also a number of ways that she could have ameliorated his conditions. Well, first of all, there were other mental health programs that she could have sought out and tried to get him into at the prison. ICP was not the only program. But there were other steps that she could have taken to ameliorate his condition. She could have moved him to another part of the segregation unit that was less isolating. Does the record reveal the government ever explaining why they either couldn't or didn't take these steps that you're mentioning? No, Your Honor. But one thing that the record does reveal that I think is important to emphasize is that Defendant Schroeder's failure to move Mr. Finley promptly to ICP after he had been approved for ICP appears to be less about anything about a wait list or people ahead of him in line, so much as her making a decision that his behavior did not yet warrant him moving to that program. Mr. Finley himself testified to that on page ID 704. He said that Defendant Schroeder would come down and do weekly rounds and he would say to her, I'm not doing well, I'm struggling down here, I'm trapped, I'm supposed to be going to ICP, when am I going to ICP? And she would consistently tell him, that's dependent on your behavior. Defendant Schroeder herself testified to that at page ID 828. She was asked, was Mr. Finley's ability to move from segregation to ICP dependent on your decision? And she said, yes, the SEC would have to review his behavior to make sure that it was commensurate with the privilege of such a placement, or such a privilege in placement. And Mr. Finley's corrections expert, based on that evidence, concluded that it appeared that these officials were holding out this mental health treatment program as some sort of incentive that he had to earn through his behavior, as opposed to a necessity to treat his mental illness. How do you get around the qualified immunity that these officials would have? What case do you have that would show that they clearly should have known that they were violating his constitutional rights? Your Honor, we've relied on the Comstock case from 2001. Comstock held, based on case law that long predated Comstock, that a prison official who ignores a prisoner's known psychiatric needs or known self-harming tendencies violates the Constitution. And that's clearly established. Can I ask a follow-up to that? Help me grasp, are you claiming his constitutional rights were violated because of conditions of confinement, or because he was denied medical needs? Your Honor, the claim is both. We framed it as a conditions claim, because... If it's a conditions claim, then Comstock's a medical needs case. So it can't clearly establish a conditions case. But Your Honor, the condition that they imposed affected, harmed him psychiatrically. I understand that, but then you need a conditions case, not a medical needs case, because that was about getting psychiatric care. That was a clear medical needs case. Your Honor, defendants did fail to get Mr. Finley his medical needs in this time period. That's why I asked the preliminary question. But if you're bringing a conditions case, what's your best, in response to Judge Gilman's question, what's your best conditions case? Your Honor, what I would say is that this court has already passed on Mr. Finley's claims in 2018, and in 2018... That was a motion to dismiss. We view it differently. Go ahead. That's correct. But Your Honor, nothing about Mr. Finley's allegations have changed, and all of the evidence has just bolstered and confirmed his allegations. You don't have a conditions case? Your Honor, in this court's decision in 2018, this court relied on Bays v. Montmorency County, and this court said that in Bays v. Montmorency County, the conduct occurred in 2013. And this court said that the conduct in that case was not nearly as problematic as defendants' conduct in this case. And yet, the defendants were on notice in that case, that defendants were on notice in that case that they violated a clearly established constitutional right. Our position is that if you can't... If all defendants had done, let me put it this way. If all defendants had done in this case was ignored Mr. Finley, and allowed him to fester for three and a half months, to devolve psychiatrically, to harm himself, that would be clearly unconstitutional under Comstock, under Clark Murphy, under Bays, under all the cases that those cases have relied on. Under the medical needs. Correct. They did do that, but they took it one step further. They imposed on him the one condition that they knew would, and in fact did, harm him. Harmed him psychiatrically, and it caused him to harm himself physically. And so, if just ignoring those needs is a clearly established constitutional violation, then certainly imposing... The way we've defined the Eighth Amendment, right, is we've got a conditions of confinement bucket, and we've got a medical needs bucket. And you're bringing in the conditions of confinement bucket. And what you're saying is the medical needs bucket clearly establishes the conditions of confinement bucket. Your Honor, what I'm saying is that that distinction is a bit semantic in this case, where the condition of confinement that they're imposing on him, the flip side of that is that they're not getting him. But Westby and its progeny out of the Supreme Court say, we've got to point to a specific case involving a specific situation, right? That's why the Eighth Circuit, the Tenth Circuit, both said it wasn't clearly established on a conditions of confinement regarding segregation mentally ill. I think Fourth and Third said it was, so there's a split out there on this issue. Your Honor, I think that Comstock and those cases did provide defendants adequate notice, whether you call them conditions or whether you call them... The officers themselves aren't thinking of it that way, right? They're not parsing out, is this a condition situation or a medical needs case? That's why it has to be clear to the officer that what they're doing is improper. Yes. That's the whole point of qualified immunity. That's correct, Your Honor. And I mean, we think that this is one of the rare cases in which you don't even need to look at case law because the constitutional violation here was obvious. They knew that this condition was going to harm him. Even the Supreme Court doesn't agree with that. I mean, all you can point to is concurrences and separate writings. No, Your Honor. We point to the Supreme Court's decisions in Hope and Taylor v. Riojas. Those cases established that where there's a constitutional violation that's obvious, a defendant doesn't need to scour the federal record to find a case that's directly on point. Any further questions? Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court. Assistant Attorney General Joshua Smith on behalf of Defendants Apeliz, Huss, and Schroeder. I'm asking you to affirm the district court opinion for three reasons. First of all, and I think it was clear both in the briefing and the counsel's argument, there's not a clearly established right under the Eighth Amendment for a mentally ill prisoner not to be placed in administrative segregation. Second, as- I think she's defining the right broader, to be fair. She's not saying it's confined to just administrative segregation. What she's saying is it's clearly established you can't put an inmate in some type of situation where it's clear they're going to harm themselves. The case law demands that it has to be sufficiently on point. Not exactly on point, mind you, but sufficiently on point to notify a reasonable government official. I think you alluded to the Wesby case and in more recent decisions by the United States Supreme Court, such as in White v. Pauley, the court has expressly said it can't be defined at too high a level of generality. It still has to put those government officials on notice. What about Comstock and Clark? Comstock, Clark, there's the Bays case, J.H. There are several cases in out-of-circuit cases like Palakovic that counsel has cited. All of those cases are distinguishable because for the exact reason you stated, Judge Thapar, during counsel's argument. Those are medical treatment cases. The Eighth Amendment delivered in different standard applies to both conditions of confinement and to the medical treatment cases. There's a long line of medical treatment cases leading up to Clark that establish that first of all, an inmate has an absolute right to have a serious medical need taken seriously and treated. And second, that includes psychological injury or mental illness. And what she's saying is you're ignoring the medical need by putting him in administrative segregation for three months, essentially.  I think what she's asking this court to do, though, is essentially to do exactly what you questioned her on, which is to conflate two separate standards. And that's not something on which these prison administrators would have been on notice about. I guess I'm particularly confused given that the prison rules clearly require that if somebody has some mental health issues, they've got to be seen by somebody with experience in diagnosing mental health problems, right? You have mental health officials there. Correct. And those, at least one of them, did meet with him and diagnosed him and told the people that were responsible for his confinement decisions that if you put him in administrative desegregation, he's going to decompensate and he's going to hurt himself, right? Somewhat. I think you're referring to Ms. Salmi. She had several statements for hearings where she said a prolonged period in administrative segregation will likely cause harm to Mr. Finley. I believe that's what you're alluding to, Your Honor. So the two defendants are aware of that? They're aware that a prolonged period is, yes. Well, are you arguing that this three and a half months here was not prolonged? I mean, that could be one argument, I suppose. I don't see you making that. We did make that argument, that it was not a prolonged period. Now, what Mr. Finley has alleged is that he was put in solitary confinement or administrative segregation indefinitely. The record does not support that contention, Your Honor. He was, and I think there were some questions on this. Now, the period counsel was talking about is there was a September 26th hearing for a major misconduct. The following day after that hearing, the SCC, Security Classification Committee, met and determined that Mr. Finley should go into administrative segregation. Two days after that, he obtained razor blades, he swallowed razor blades, he was taken, must go to University of Michigan Hospital, they operated on him, they removed the razors, he came back, he was in an observation cell, he was given medication, then after his condition had stabilized, they moved him to administrative segregation on October 25th of 2016. Now, I believe it's two days after that, Ms. Salmi, who's the, and I do apologize, because there are way too many acronyms in correctional law, but she's the Qualified Mental Health Professional, QMHP. Ms. Salmi recommended at that point that Mr. Finley should go into the ICP, the Interim Care Program. That was on October 27th. That was against the background of her having told the prison officials that if he was kept in administrative segregation for a long period of time, he was going to harm himself and decompensate, right? That is correct, Your Honor. So they know that. Then they have subsequent hearings, and they don't bring anybody that's ever met with him or knows anything about him to the hearing to discuss what the consequences would be of their confinement decisions. Is that a fair statement? Mr. Hares, who was a Qualified Mental Health Professional, was there. But he said he never met with the guy. He did say he never met with him, but he is a Qualified Mental Health Professional. And he said he wasn't, he believed that he did not have the right to question what their decision was. I would contest that, Your Honor. Okay, so that's an open question. But then the prison officials leave that whole section of the report blank. They do. And I can address that in two points, Your Honor, and I can cite to the record. Mr. Hares was deposed. And at ECF 88, page ID 803, he stated that from a mental health standpoint, if the prisoner has an acute problem, that gets addressed immediately. And he also said that that box that he didn't fill out, they don't fill that out unless there's an acute need. Counsels mischaracterized that as him saying that he didn't believe he had the right to speak out or put something in that box. He specifically said that he would put something in that box if he felt there was an acute need. He did not feel there was an acute need here. And when we look at Salmi's recommendations... This person that you're referring to had not met this, had not treated this prisoner, right? That is my understanding. Hadn't met him. That is my understanding. Does the record say he had even reviewed the guy's records? I can't state that, Your Honor. It's kind of sort of a thin reed you're relying upon here to say, well, they had a person there and that's good enough. How does that make sense? Well, I think you also have to look at Ms. Salmi. Ms. Salmi had been treating Mr. Finley. Ms. Salmi had met with Mr. Finley. And Ms. Salmi's determination leading into this, it was earlier than that, September 26th hearing and that September 27th classification. She had said a prolonged period, a prolonged period in administrative segregation would be harmful to Mr. Finley's mental health. She also clarified on her... Did she qualify? Did she explain that at any point in the record as to what is a long period? She did. I don't have the record site for that, but I did put it in my brief, Your Honor. What Ms. Salmi said was a really long time. Now, she did not put an exact duration on that, but if we look at the due process case law, this court has looked at what constitutes an excessively long period in administrative segregation and it is not two and a half months. And I think the important point here as well is that through that month of October, Mr. Finley's condition stabilized. When he went into administrative segregation on October 25th, his condition had stabilized. He had no future instances of self-harm and he was in administrative segregation during that period. He had a loss of privileges due to prior misconducts. Ms. Salmi met with him regularly, sometimes outside his cell, sometimes in a separate secure location. So he did have mental health services. That's one of the things that distinguishes this from the Third Circuit case, PLCOVIC. I think another distinction, at least for qualified immunity, is many of those out of circuit cases were all decided, including PLCOVIC, which is not on point, but is the closest. Those were all decided after the instant facts here. In PLCOVIC, that decision came out in April of 2017. Mr. Finley was out of administrative segregation. So even if this court finds that that is persuasive authority, that that out of circuit case could have put these defendants on notice, it couldn't have put them on notice because it occurred after the fact. Does the prison rule that applies a three-day rule for something, does that put them on notice? Not for qualified immunity purposes. And actually, Your Honor, you covered this in the... I realize that can't... The rule can't constitute a constitutional violation. I get that. If this case is remanded, you cited to the Harris case in the previous Finley case that came up to this court, Your Honor, and what you specifically said is spot on. What Harris held is that when it comes to the trial, excuse me, determining the subjective portion of deliberate indifference, we've got an objective portion and a subjective portion, that that's where knowledge of the regulation comes in. That could be used, for instance, at trial or in a brief before the trial court to determine they did have this subjective consideration because they did have that rule and they disregarded it. Now, I think we disagree as to the interpretation of the rule, and Ms. Schroeder testified that she didn't think it applied here, but on remand, if it gets remanded, that would be a separate issue. But I do also want to know... So is your bottom line position here that you acknowledge you can't put somebody in administrative segregation if you know that it's going to harm them, but it's not a constitutional violation unless they're in there for a really long period of time and we don't know what really long means? In terms of the case law, this circuit has defined what a really long time means, to use that term, Your Honor. But in terms of the qualified immunity on the Eighth Amendment, no, there's simply not... It's not clearly established that placing a mentally ill person in administrative segregation violates the Eighth Amendment. I'm really asking you, without being as specific as I should be, both the question of was there a constitutional violation, and if so, was the law clearly established? So if we just stick for a moment with constitutional violation, I'm trying to figure out when your position on behalf of the state is that a constitutional violation would have occurred under the facts of this case. And what I understand you to be saying is, well, maybe it would have occurred at some point, but it didn't occur here for constitutional purposes because it wasn't too long. Thank you for that clarification, Your Honor. In my own edification, in terms of the qualified immunity analysis, we're talking about that first prong, just the constitutional violation itself, correct? Yeah, well, I've tried to make that more clear. And once you answer that, then we'll go back to clearly established. Understood. The trial court found that there was a constitutional violation, that is, that first prong of the qualified immunity analysis, Mr. Finley had satisfied that. And are you contesting that? We contested in our brief. I have to say, quite frankly, we didn't file objections on that portion of the opinion and we did not file a cross appeal. The way I characterized it in the brief is that could be an additional reason for affirming the district court on different grounds. And to answer your question, what would, in my view, constitute a violation of that Eighth Amendment right, regardless of whether it's clearly established? I would actually urge this court to take a look at that due process case law on administrative segregation because there is a good body of it. And this court's held that, I don't know if the court used the words a short duration, but durations from approximately 61 days all the way up to, I believe, one year did not per se violate the Constitution. When you get to that two and a half, or excuse me, Jones was two and a half years, that didn't violate the Constitution. When you get to Selbin, an individual who had been confined to administrative segregation for 14 years, that's clearly excessive. Now, I'm not arguing that we have to wait 14 years for it to be clearly excessive, but I am saying we can look at that due process case law and, by analogy, at least apply it to determine what is a really long time, to use Ms. Salmi's words. I hope I adequately answered your question, Your Honor. I think you did. You're not appealing the constitutional violation portion of this opinion. We are not. You're just saying right or wrong, it wasn't clearly established. That's correct, Your Honor. And, I mean, really the issue here is when you look at the case law, it has to be something that puts a reasonable official on notice. And, one of the key, there's a couple of key cases here. One, to me, really stands out is Wilson v. Lane. That was an opinion written by Rehnquist. It's not an Eighth Amendment case, but it is a qualified immunity case. And, the fact situation is interesting. Police have a warrant. They're going to execute that warrant. For reasons only known to the police and the media, they decide to bring a reporter along with them to do a ride-along. The homeowner did not consent. The reporter was there for the execution of the warrant. The homeowner sued. And, what the Chief Justice held was, that might violate the Fourth Amendment. It probably does violate the Fourth Amendment because it was outside the scope of the warrant and the homeowner didn't consent. But, the information available to those officials at the time, the police officers, meant that they reasonably didn't know that it would violate the Fourth Amendment. And, you can't expect governmental officials to predict the future course of the law. The very fact that you have different courts in different circuits reaching different decisions shows that it's not clearly established. And, again, the case law that Mr. Finley identifies that's out of circuit is generally those medical treatment cases, like Palachovic. And, they're distinguishable. Mr. Palachovic did not receive any counseling. He did not receive psychological services. And, I think one of the key issues, too, and by the way, Judge Thapar, that was also at I believe the 12B6 stage. So, there wasn't a developed record and qualified immunity wasn't raised. See my time's expired. Would you mind if I just finish my answer, Your Honors? Yeah, you can finish. Thank you. The other salient fact in that case was that Mr. Palachovic alleged that the prison policy was simply that if an individual's mentally ill, they place them in administrative segregation. That was not the case here. Mr. Finley was placed in administrative segregation due to his misconducts, his condition stabilized. And, I think that these officials, with the information they had at the time, made a reasonable decision that is indeed covered by qualified immunity. Thank you, Your Honors. Thank you. Could you explain, just before you sit down, the question that was left open when we were having this conversation with Ms. Manta. Why didn't the state do anything more than they did? Why didn't they move him up on the list? Why didn't they move him out of the base cell where there are no windows, no air circulation, whatever the other complaints were? Just seems like there are a number of things that could have been done to ameliorate this guy's situation. And, there may be very good reasons why they didn't or couldn't, but I don't find those in the record. That's an outstanding question, Your Honor. It's actually covered in, I believe it's Salmi's deposition. She states that in terms of why Mr. Finley wasn't moved up on the ICP list, there are limited bed spaces. The email in which Ms. Salmi sent to Schroeder and other people within the prison for that to say, he needs to go to ICP, said, you should do it within three days, that's what the prison rule says, may depend on bed availability. So that's recognizing that there's limited bed space. A prison is not unlike the outside world in one area, and that is, there are limited resources and there are limited medical and psychiatric resources. Now, what Salmi testified to was that she met weekly with other mental health professionals and housing staff. They looked at who was on the ICP wait list, and they determined whether to move somebody up or move somebody down. She does not use the word triage, but I think that's a reasonable inference from what she stated. That is, if a person's condition is stabilized, they're not going to get bumped up on the list. They're not necessarily going to lose their spot, unless, if there's somebody that's clearly deteriorating that needs immediate action, that person will get moved or bumped up the list to ICP. Mr. Finley's condition- But why didn't they put him in a cell that wasn't in the very bottom of the prison? They got more life, they got more contact with other people. Part of the reason that he was given a base level cell, Judge Gilman, was specifically because when he was in lower areas of confinement, even within administrative segregation, he was still able to obtain razor blades. He would get them through contact with other prisoners, so that was a critical issue here, was to limit his contact with other prisoners. In terms of natural light, I mean, Mr. Finley did have opportunities to- Does the record corroborate that? I thought the record showed that for whatever reason, the guards gave him the razor blades. A correctional officer gave him a razor blade on one occasion, Your Honor. Mr. Finley informed the guard that he needed a razor to shave. The guard gave him the razor, and Mr. Finley, I believe, either swallowed it or broke it apart to cut himself. The other razor blades he obtained from other inmates through a process known as fishing- And that's in the record? That is in the record, yeah, that he would, in quotes, fish. Did that answer your question, Judge Gilman? Well, I'm not sure why they wouldn't have given him a cell that let him have more light or other contact that would not cause him to decompensate as much while he was waiting to be put into this program. There are a couple reasons, I think. I mean, first and foremost, he complained about the lack of natural light at base level. Mr. Finley was given the opportunity to exercise. Now, Mr. Finley contests that, but when you look at the record and look at Mr. Finley's own testimony, and you look at the forms when he was checked every day in the base level unit of administrative segregation, he wasn't allowed to exercise for a duration because of loss of privileges due to the misconducts. When he was allowed to exercise, by Mr. Finley's own words, it was winter, it was freezing. That's at 88-4, page ID 703, and for the deposition, it's page 117, lines 3 through 19. Now, I'm not unmindful of the fact that Mr. Finley was in Marquette, and this was indeed in winter, and I think everybody in this courtroom can recognize Marquette is not exactly known for balmy winter weather. The opportunity was afforded to him, though, Your Honor. Now, this is distinctive from, there was a case, it's actually cited in here on due process, where there was an allegation that a prisoner was without light for 35 days, and held that that violated the Eighth Amendment. That was a case where the light bulb had burned out, the prisoner had complained repeatedly that he didn't have light, and he didn't, it dark, there's no light, and it wasn't replaced for 35 days. In this case, this court, we've remanded it for finding on that issue. This case is quite different, though. Mr. Finley was afforded some opportunity for natural light, and he couldn't be placed in a less restrictive setting and not harm himself. What you're quibbling about was one hour a week, isn't it? It's limited. I don't know if it's exactly one hour a week. It is a limited amount of exercise. That is true. But again, that doesn't amount to a conditions of confinement violation here, and what specifically is raised on appeal is not that he didn't have sufficient sunlight, but rather placing him as a mentally ill prisoner into administrative segregation violated the Eighth Amendment, and on that issue, there is no clearly established authority in this circuit. Thank you, Your Honors. Your Honors, just a couple of points. On the question of the ICP wait list, opposing counsel has offered various reasons why they couldn't have moved him sooner or couldn't have ameliorated his conditions. Defendants are certainly welcome to argue those reasons to the jury. We are on summary judgment, and on summary judgment, the facts have to be taken in the light most favorable to Mr. Finley, and the facts in the light most favorable to Mr. Finley are that Defendant Schroeder knew that Mr. Finley had been approved for this program, knew he needed treatment, knew he was suffering and not doing well in the conditions he was in, and yet she made no efforts whatsoever to either expedite him on the wait list to find him other mental health treatment or to ameliorate the conditions that he was in. Well, that may be true, but what your fellow counsel says is that the mental health people that supposedly did know what they were doing met every week and discussed the status of people on the wait list and determined whether to leave them there or move them up or move them down. Your Honor, what Defendant Schroeder testified to was that she met weekly with both the housing staff and the mental health staff to discuss the people on the wait list, and that her determination was whether somebody's behavior would move them down the list. So she was viewing it from the perspective of, does your behavior warrant you moving into this program, which again, Mr. Finley's corrections expert testified, that's not appropriate. This ICP is not an incentive, a carrot to hold out in front of a prisoner. This court, I would just note that this court said in Mr. Finley's prior appeal that prison officials can't escape a deliberate indifference claim by fetching a Band-Aid if an inmate is hemorrhaging, and we would posit that putting him on the wait list is not just fetching a Band-Aid, it's like holding the Band-Aid out in front of him and saying, you have to earn this. The hard thing for us is we don't know who's on that wait list. So you're saying, jump him, why couldn't everyone come to court and say, look at how bad my guy is, jump him? That's a constitutional violation not to. Again, on summary judgment, you certainly can't infer from the absence of that evidence that the wait list was super long or that... But what's the evidence that the people on the wait list weren't in as much need? That burden's on you, not them. There wasn't evidence to that effect, Your Honor. The evidence is that Defendant Schroeder said she could have moved him up and down, and again, even if you accept that there were people ahead of him, there were other things she could have done to ameliorate the situation that he was in, and she didn't. The one thing that she did do was continue to rubber stamp him being in these extreme isolating conditions that he was telling her on a weekly basis was harming her. That comes back to my initial question, which is, it is at core a conditions of confinement case, and as your friend points out, there's no case supporting you in that regard. Your Honor, at bottom, the qualified immunity question, which again, has to be taken in the facts, in the light most favorable to Mr. Finley. Not the clearly established. Yes, it does, Your Honor. The clearly established question has to be taken in the light most favorable to Mr. Finley. No, you're pointing to... For clearly established, you have to point to a case that clearly establishes that what they're doing is a constitutional violation. That what they're doing... That's not a question of fact. Correct. I'm sorry. That what they're doing as construed in the light most favorable to Mr. Finley. Yes. At bottom, Your Honor, that question is about notice. It's about notice, right? Sure. That's... Go ahead. I'm sorry. On the facts in the light most favorable to Mr. Finley in this case, defendants knew. They knew because they had been warned by his clinician, because they had seen over the course of September that being put in isolating conditions aggravated his psychiatric condition and drove him to harm himself. They knew that. Defendant Huss even told Mr. Finley, I'm not going to put you in solitary earlier in the month because she knew that that was harmful to him. And yet, at the end of September through January 2017, they put him in that very condition that they knew was going to harm him. Their knowledge... The last case, I promise. Mm-hmm. What is the best case that clearly establishes that? Whatever you say, I'm not going to question. I'm just going to write it down. Your Honor, we point to Comstock. We think Comstock clearly established that. But our point... I don't agree with you on Comstock, do you, Luz? Give me one more, please. We pointed to Clark Murphy versus Forbach. We've pointed to Bays. There are a number of out-of-circuit cases, as my opposing counsel has noted, that has recognized these exact principles in the construct of a conditions claim, a claim that was brought as a conditions case. Clark versus Coop in the Third Circuit. There are a number of cases that have... That post-dated this, but yeah, they're okay. But the conduct pre-dated. Sure, but the holding post-dated.  Sure. Any other questions? Judge Gilman? I have no further questions. Judge McKee? No, thank you. Thank you. I think you're taking this pro bono. It was you and the UCLA Clinic, right? That's correct, Your Honor. Thank you very much for your thoughtful argument and for your representation. I can't tell you how much we appreciate it. Your briefs are excellent. Your argument's excellent. So, we hope you'll keep coming back. Thank you, Your Honor. Thank you.